## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **CHAPTER 11** |
| NANCY P. VENCILL, | ) | |
| DEBTOR. | ) | **CASE NO. 10-72956** |

_____

| | | |
|---|---|---|
| UNITED STATES TRUSTEE | ) | |
| | ) | |
| v. | ) | **MOTION TO DISQUALIFY COUNSEL** |
| | ) | |
| ROBERT T. COPELAND, ESQ. and | ) | |
| COPELAND & BIEGER, P.C. | ) | |

_____

### MEMORANDUM DECISION

By a Memorandum Decision[1] dated September 9, 2011 this Court ruled that the

Debtor and her counsel, Robert T. Copeland, Esq., would be required to disclose the substance of

an inquiry made by the Debtor to Mr. Copeland and the resulting advice which he gave her in

September of 2010. This discussion took place approximately three months prior to the

December 21, 2010 filing of a voluntary Chapter 11 petition by him on her behalf in this Court,

and concerned a certain tract of land which she desired to transfer to her son, Paul Robert

Vencill, III. This discussion is relevant to the pending Motion to Disqualify Counsel (the

"Motion") filed by the United States Trustee to disqualify Mr. Copeland and his firm, Copeland

& Bieger, P.C. (the "Firm"), as counsel for the debtor-in-possession and thereby effectively

vacate the Court's Order of January 13, 2011 approving such employment. Pursuant to a

separate Order[2] implementing that Memorandum Decision, the Debtor and Mr. Copeland filed

_____

[1] Case docket # 113.

[2] Case docket # 114. This Order specifically provided as follows:

separate sworn statements regarding that consultation.  While there are some differences in those statements, both agree that Ms. Vencill, after having engaged Mr. Copeland in connection with her financial problems, did ask his advice about whether she could sell the parcel of property in question to her son with a bankruptcy filing in prospect and that he advised her as to how that might be done and that such a transaction would have to be reported in her bankruptcy filing. Although the transfer, but not its date, was noted in the Debtor's Statement of Financial Affairs ("SOFA"), as was the payment by her to the Firm of a Chapter 11 case filing fee of $1,039 and a $10,000 retainer against attorneys' fees and costs, again without the date such payment was made, the involvement of Mr. Copeland in rendering advice on the property transfer was not disclosed in any filings made with the Court in connection with the application for approval of the Firm's employment by the debtor-in-possession for the general conduct of the case.  The Motion is now before the Court on the merits.  Final briefs have been filed by the parties and the Motion is now ready for decision.

Although the grounds set forth in the Motion are somewhat broader, the United States Trustee, by counsel, in his written Closing Argument submitted after the conclusion of the evidentiary hearing, asserts that the Debtor's counsel should be disqualified on two grounds:

---

> [T]he Debtor and Mr. Copeland shall file **under seal** with the Court (and provide copies to the United States Trustee) separate sworn statements providing their respective current recollections of conversations, and copies of any notes thereof made by either of them at the time such conversations took place or shortly thereafter, and copies of any relevant documents provided by Ms. Vencill to her counsel on or before December 28, 2010, concerning the September, 2010 sale of the property to her son, including specifically its value, and any advice he provided to her concerning the making of such transfer or how it should be reported in the Statement of Financial Affairs to her bankruptcy petition.

2

> (1) Mr. Copeland and the Firm have not provided adequate counsel or comported with their fiduciary duties both before the filing of the case or since the filing of the case; and, (2) the pattern of inaccurate or incomplete disclosures on behalf of the estate also appear in the disclosure made to the Court by Mr. Copeland and the Firm in support of their employment application.

Not surprisingly, Mr. Copeland and the Firm see it quite differently. For the reasons noted in this Memorandum Decision, the Motion will be granted and the Debtor will be obliged to secure new counsel to represent her as debtor-in-possession in this case.

## FINDINGS OF FACT

According to the Firm's time records[3] filed in this case, the first recorded conference between Ms. Vencill and Mr. Copeland occurred on September 14, 2010 and involved two hours of time. On that date Ms. Vencill paid to the Firm a retainer of $10,000 for services to be rendered and an additional sum of $1,039 for "filing fee."[4] The latter amount is the precise filing fee for a Chapter 11 case which was in effect at that time. Accordingly, it is apparent that from the very first conference which generated a chargeable time entry in the Firm's accounting system both Ms. Vencill and Mr. Copeland expected that the Firm would be filing a Chapter 11 bankruptcy reorganization petition for her. Before filing the case, however, Ms. Vencill wanted to take care of an undone item of family business: the transfer to her son of an acreage tract which adjoined the son's residence property and which according to Ms. Vencill

---

[3] Pre-bill Worksheet attached to counsel for the Debtor's Amended Response to United States Trustee's Motion to Disqualify Counsel, case docket # 86

[4] United States Trustee's Exhibit F (Response to United States Trustee's Objection to Compensation and Motion to Remove Counsel, case docket # 87).

her deceased husband had wanted the son to have.  It appears that Ms. Vencill did not raise this subject with Mr. Copeland during that initial conference but called him a few days later to ask him whether she could sell this property to her son.  In her statement she represents that she wanted to go about this in the right way and that she didn't want to do anything wrong.  In their statements both agree that Mr. Copeland advised her that she could sell the property to her son but that the transfer would have to be disclosed in the bankruptcy filing.  Their recollections differ as to what he told her about a permissible sale price.  He recalls that he told her "that she could sell property, so long as [it] was sold for fair market value," that she asked him what he "meant by fair market value," and that he "advised her that it had to be based upon a third party opinion and that the Russell County tax assessment would give a good indication of its fair market value."  He then states that he "asked her what the fair market value was and . . . she told me . . . what the tax ticket stated was the fair market value," that he "advised her that if that was the fair market value, then she could sell the property to her son, so long as that sale was disclosed in her schedules."  Thereafter, his office "received from her a copy of the deed of transfer of a piece of property to her son"[5] as well as "a copy of the tax ticket that Mrs. Vencill told me that she relied upon."  Ms. Vencill's recollection is somewhat different as she recalls that Mr. Copeland told her that "it had to be fair market value or land value from my tax ticket" and

---

[5]  While not introduced into evidence at the hearing, the United States Trustee subsequently docketed a copy of an undated Deed between Nancy P. Vencill and Paul Robert Vencill, III regarding a 57.58 acre tract, case docket #115.  [The SOFA lists 56.58 acres.]  This Deed was signed and acknowledged according to the notary acknowledgment clause on September 24, 2010 and recorded in the Clerk's Office of Russell County Circuit Court on September 27, 2010.  The Debtor has not noted any objection that such deed is not the one referred to in her SOFA and the Court will treat it as such and as a proper supplementation of the evidentiary record in this matter.

that he "told me that I could sell it at the land value on the ticket."  There is no indication in either of their statements that he made any recommendation that she defer any proposed sale of the property to her son until after her bankruptcy filing when it might be accomplished with the approval of the court and after notice to her creditors.

Exhibit F also indicates that on September 27, 2010 $2,000 of the $10,000 retainer was disbursed to the Firm.  To and including that date the records indicate that chargeable time valued at $1,935 had been expended for Ms. Vencill's representation.  Both Mr. Copeland and Ms. Vencill testified that this disbursement was expressly approved by her at the time.  The same exhibit also indicates that on December 21, 2010, the day the petition was filed, the $1,039 amount for the filing fee was disbursed.  Under the mandatory procedures in effect in this Court at that time, bankruptcy petitions filed by attorneys admitted to practice before the Court must be filed electronically and the requisite filing fee paid by a credit card.  No other amount has been disbursed from the retainer since that time.

The Debtor's SOFA filed on December 28, 2010 does disclose in section 10 the sale of 56.58 acres located at Clinch Mountain, Lebanon, Virginia for $16,400,[6] but does not list the date such transaction occurred although such information is specifically called for in the Official Form.[7]  The SOFA also discloses in section 9 the payment of the $10,000 retainer and

---

[6] Other evidence provided in the case indicates that the amount was $16,000 rather than $16,400.

[7] The Debtor filed an Amended SOFA on August 19, 2011 that disclosed the sale of the property to the son and listed the date of the sale as September 1, 2010.  In an Amended SOFA filed on October 26, 2011, the Debtor discloses the additional $69,000 paid by the son in July 2011 and also discloses several additional transfers that were not listed in the prior versions of the SOFA.

the $1,039[8] filing fee to the Firm but leaves blank the column for the date such payments occurred.  It does not disclose the $2,000 disbursement from the retainer over to the Firm's regular account on September 27, 2010.  Accordingly, whether by design on Mr. Copeland's part or simply as a result of a casual approach to completion of the SOFA disclosures, one reviewing sections 9 and 10 of that pleading would know that a sale to the son had occurred and that the Debtor had paid the retainer and the filing fee to the Firm, but not when such events had occurred and certainly not that the transfer to the son had occurred after the retainer and filing fee had been paid over to the Firm.  The Declaration of Robert T. Copeland filed in support of the Debtor's Application for the Court's authorization to employ the Firm as her counsel as debtor-in-possession in this case discloses in paragraph # 8 that "[p]rior to the commencement of Applicant's Chapter 11 case, the Firm was employed by and was rendering specialized legal counsel and advice to Applicant."  There is nothing in either the Application or the Declaration which provides any indication that Mr. Copeland had advised his client concerning the sale of property to her son prior to such transaction taking place.  In fact it appears that Mr. Copeland has purposefully avoided disclosure of that information to the United States Trustee or the Court and that such disclosure would not have occurred but for the persistence of counsel for the United States Trustee in pursuing that inquiry to the point of obtaining the September 9 ruling from the Court requiring it.[9]

---

[8] All three SOFAS filed in this case state that the amount is $1,089 but Exhibit F contains the correct figure of $1,039.

[9] In contrast, in the case of *In re Byington*, 454 B.R. 648 (Bankr. W.D. Va. 2011), in which Mr. Copeland faced an objection from the United States Trustee to his employment as counsel for the debtors-in-possession in that case, he expressly represented to the Court that he had not been consulted by his clients before they transferred their ownership of three family

The problem with relying upon the real estate tax payment receipt for determining the fair market value of the property which Ms. Vencill sold to her son became dramatically apparent at the section 341 first meeting of creditors after the filing of the petition. At that meeting counsel for one of Ms. Vencill's creditors pointed out that the value which had been relied upon in determining the purchase price was the "use value" assessment of the property rather than the full fair market value assessment, which was $84,900 for the land.[10] Although Ms. Vencill professed to have no knowledge of "use value" assessments, the United States Trustee introduced into evidence[11] the 1999 application to Russell County for use value assessment of the property in question signed by Ms. Vencill and her late husband and the county treasurer's receipt made out to Ms. Vencill for the filing fee associated with such application.

Following this development at the creditors' meeting Ms. Vencill went back to her son and obtained his agreement to pay an additional $69,000 for the acreage tract. Mr. Copeland initially filed on her behalf and noticed to creditors a motion[12] to obtain court approval of the settlement of the bankruptcy estate's fraudulent transfer cause of action against the son for the additional $69,000 which he offered to pay. When this motion elicited an objection[13] from

---

owned companies to a company owned by their son about a year before Mr. Copeland filed a Chapter 11 petition on their behalf. 454 B.R. at 651.

[10] Both assessments included an assessment of $800 for improvements. According to Ms. Vencill's testimony, this amount was for a shed on the property which was torn down several years ago. The use value assessment for the land alone was $15,600.

[11] Exhibit Z.

[12] Case docket # 35.

[13] Case docket # 44.

the United States Trustee, it was withdrawn pursuant to an Order of this Court entered on May 6, 2011,[14] but was soon followed by a new motion[15] crafted by Mr. Copeland to obtain court approval of the sale of the property to the son for $85,000.  This new motion provided an opportunity for any prospective buyer to make a higher offer but proposed that any competing bid would have to be a minium of 5% above the son's offer.  This motion did not draw an objection and was heard on June 1, 2011.  At that time the attorney who had made known at the creditors' meeting the "use value" of the property as the basis of the sale price amount for the transaction appeared and after consultation with his client stated that the latter did not care to offer any competing bid for the property.  Accordingly, there being no opposition to the motion, it was approved by an Order of this Court entered on June 14, 2011.[16]

Schedule A to the Debtor's petition listed eleven separate parcels of real property which she owned as of the time of her filing and which she valued in the aggregate at $1,125,275.[17]  Although the Schedule does not list the jurisdiction or jurisdictions in which such parcels are located, it appears that most of them, and very possibly all, are located in Russell County, Virginia.  Despite this concentration of real estate investments, Mr. Copeland did not

---

[14] Case docket # 50. Counsel for the Debtor advised the Court at the April 20 hearing on the motion that it would be withdrawn.

[15] This motion was filed on May 10, 2011.  Case docket # 52.

[16] Case docket # 67.

[17] Although not so noted in Schedule A, the valuations used in that Schedule appear to be in each case the assessed values for county real estate tax purposes rather than reflecting any independent judgment by the Debtor as to the "current value" of such properties.  This has led to some incongruous pleadings.  For example, she listed the 6.990 acre parcel designated as the Lebanon Equipment business property in Schedule A to her petition as having a value of $417,300 but her Disclosure Statement (Case docket # 58) for her proposed Plan of Reorganization mentions a recent appraisal for this same property of $1,500,000.

request that a title search be done in that county to determine the status of any liens against any

of these properties or any recent conveyances of any other parcels which would be disclosed by

such a search, electing to rely upon the information and documents which Ms. Vencill brought to

him.  Similarly, although Ms. Vencill advised the Firm, as was disclosed in section 19(D) of the

SOFA, that within the preceding two years she had given financial statements to three different

banks, according to her testimony at the August 16 hearing Mr. Copeland never requested that

she supply him with copies of those financial statements.  He did obtain from her, however, after

receiving a specific request from the United States Trustee following the filing of the schedules

to her petition, a listing of her real estate interests[18] which she had apparently been accustomed

to using in preparing personal financial statements and which placed a value on her real estate of

$4,919,000.  In this listing the parcel conveyed to the son was listed but its value was not,

reflecting the fact that she no longer owned it as of the time the petition was filed.  The evidence

does not disclose what value she accorded to this parcel in the financial statements she gave to

the banks.

On May 13, 2011 the Firm filed an application[19] for approval of interim

compensation in the case which set forth time entries both before and after the petition filing date

and also before and after the disbursement on September 27, 2010 of $2,000 to the Firm's

general account from the $10,000 retainer which it had received on September 14.  The time

entries set forth in that application from September 28 thru the December 21 filing date, just shy

of three months later, were indicated to have a value of $2,138.00.  This application also drew an

---

[18] Exhibit # AA, Case docket # 103.

[19] Case docket # 54.

objection[20] from the United States Trustee and was withdrawn by the Firm after it determined

that it failed to include all applicable time entries due to the Debtor's name being recorded in

different entries variously as Vencill or Vencil.

The United States Trustee has also filed a motion[21] to convert this case to Chapter

7 or in the alternative to appoint a trustee and thereby relieve Ms. Vencill of her authority as

debtor-in-possession.  The hearing of this motion has been deferred upon agreement of the

parties until after the disqualification motion is determined.  One of the factual predicates set

forth in that motion as a basis for conversion is the Debtor's pre-petition transfer of the parcel to

her son for a grossly inadequate consideration as being evidence of her dishonesty or gross

negligence.

## CONCLUSIONS OF LAW

This Court has jurisdiction of this proceeding by virtue of the provisions of 28

U.S.C. §§ 1334(a) and 157(a) and the delegation made to this Court by Order from the District

Court on July 24, 1984.  Questions of the approval or disqualification of counsel to represent a

Chapter 11 debtor-in-possession and the consideration of applications for compensation of such

counsel are "core" bankruptcy matters pursuant to 28 U.S.C. § 157(b)(2)(A) and (B).

Objections to applications for authorization to employ counsel for Chapter 11

debtors-in-possession are not common occurrences, but a motion to disqualify counsel whose

employment has previously been approved is a very rare event, at least in this Court.  Because of

the disruption such motions almost inevitably cause to the progress of the case and the potential

---

[20] Case docket # 65.

[21] Case docket # 77.

10

unfairness to counsel resulting from disqualification after substantial services have been

rendered in reliance upon the original ruling which approved the employment, they indeed

should be rare.[22]   The Motion which is now before the Court, however, is not the only instance in

which such a disqualification motion has required this Court's consideration.   In the case of *In re*

*Five Forty Park Corp.,* No. 03-04746 (Bankr. W.D. Va. Sept. 30, 2004), this Court granted a

disqualification motion prospectively and sanctioned counsel for the debtor-in-possession by

reduction of allowed compensation for serious omissions in such counsel's disclosure of the

prior material connections the firm had with the debtor and other parties in interest in the case.

In that decision and in its recent ruling in the *Byington* case, which involved an objection to the

employment of the Firm in that case, this Court reviewed the applicable principles which are

applicable to the present controversy.

Generally speaking, a Chapter 11 debtor-in-possession is endowed with the

powers and is subject to the responsibilities of a bankruptcy trustee.  11 U.S.C. § 1107(a).

Accordingly, the debtor-in-possession's employment of counsel to represent it in the case is

subject to the restrictions set forth in 11 U.S.C. § 327, including that the attorney "not hold or

represent an interest adverse to the estate" and must be a "disinterested person."  § 327(a).  The

term "disinterested person" is a defined one under the Bankruptcy Code and means a person that:

> (A) is not a creditor, an equity security holder, or an insider;
> (B) is not and was not, within 2 years before the date of the filing of
>      the petition, a director, officer, or employee of the debtor; and
> (C) does not have an interest materially adverse to the interest of the
>      estate or of any class of creditors or equity security holders, by

---

[22] "[D]isqualification is viewed as a harsh remedy and generally is disfavored."  *David Cutler Industries, Ltd. v. Direct Group, Inc. (In re David Cutler Industries, Ltd.)*, 432 B.R. 529, 540 (Bankr. E.D. Pa. 2010) (citations omitted).

11

> reason of any direct or indirect relationship to, connection with,
> or interest in, the debtor, or for any other reason[.]

11 U.S.C. § 101(14).  While the term "interest adverse to the estate" is not defined in the

Bankruptcy Code, a number of bankruptcy courts have approved the following definition:

> Undefined by the Bankruptcy Code, an "adverse interest" has
> come to mean either (1) the possession or assertion of any economic
> interest that would tend to lessen the value of the bankruptcy estate
> or create an actual or potential dispute with the estate as a rival
> claimant, or (2) a predisposition of bias against the estate.

*Byington*, 454 B.R. at 656 (citations omitted).  Section 327(e) of the Code expressly permits the

employment of an attorney who previously has represented the debtor by a trustee or debtor-in-

possession "for a specified special purpose," even if the attorney who has represented the debtor

is not "disinterested," "if such attorney does not represent or hold an interest adverse to the

debtor or to the estate with respect to the matter on which such attorney is to be employed."

Finally, 11 U.S.C. § 1107(b) provides with specific reference to Chapter 11 cases as follows:

> Notwithstanding section 327(a) of this title, a person is not
> disqualified for employment under section 327 of this title by a
> debtor in possession solely because of such person's employment by
> or representation of the debtor before the commencement of the case.

These statutory provisions are implemented by Bankruptcy Rule 2014, which, as

relevant to the issues now before this Court, obliges the trustee or debtor-in-possession to

include in an application for employment of a professional person, "to the best of the applicant's

knowledge, all of the person's connections with the debtor, creditors, [and] any other party in

interest," and similarly requires the professional person to make "a verified statement . . . setting

forth the person's connections with the debtor, creditors, [and] any other party in interest."  This

"disclosure must be explicit enough for the court and other parties to gauge whether the person is

12

not disinterested or holds an adverse interest." *In re Midway Indus. Contractors, Inc.*, 272 B.R.

651, 662 (Bankr. N.D. Ill. 2001), quoted in *Byington*, 454 B.R. at 657.  Published bankruptcy

court decisions are quite consistent in requiring that debtors-in-possession and their attorneys,

whose employment is sought to be approved, be meticulous in disclosing "all connections" with

the debtor and other parties in interest,[23] the failure to do so justifying a court's taking significant

punitive or corrective action.  If no actual conflict of interest is presented and the Court is

satisfied that there was no intent to conceal on counsel's part, disqualification of counsel and/or

denial of all compensation is not mandated and the proper remedy is left to the Court's broad

discretion.  *See In re Northwestern Corp.*, No. 03-12872 (CGC), 43 Bankr. Ct. Dec. 93, 2004

Bankr. LEXIS 1023, 2004 WL 1661016 (Bankr. D. Del. July 23, 2004) (disqualification denied

because disclosures made early in case to United States Trustee indicated no intent to conceal);

*In re Midway Indus. Contractors*, 272 B.R. at 663-65.  Nevertheless, because "[t]he objective of

requiring disclosure is not so much to protect against prejudice to the estate, but to ensure

undivided loyalty and untainted advice from professionals[,] . . . lack of disclosure in and of

itself is sufficient to warrant disqualification, even if in the end there was no prejudice."  *Id*. at

664.  *See also In re Rabex Amuru of North Carolina, Inc.*, 198 B.R. 892 (Bankr. M.D. N.C.

---

[23]

> Pursuant to § 327, a professional has a duty to make full, candid and complete disclosure of all facts concerning his transactions with the debtor.  Professionals must disclose all connections with the debtor, creditors and parties in interest, no matter how irrelevant or trivial those connections may seem. The disclosure rules are not discretionary.

*In re Triple Star Welding, Inc.*, 324 B.R. 778, 789 (B.A.P. 9th Cir. 2005) (emphasis omitted) (quoting *Mehdipour v. Marcus & Millichap (In re Mehdipour)*, 202 B.R. 474, 480 (B.A.P. 9th Cir. 1996)).

1996) (attorneys for debtor removed because of appearance of impropriety, even though no harm done to debtor).[24]  The Court has broad discretion in how best to deal with non-disclosure of relevant "connections" and may decline to disqualify counsel from further representation but impose sanctions on counsel for incomplete or otherwise misleading disclosures, most notably by requiring disgorgement of fees already received or reducing the amount of compensation which otherwise would have been authorized if satisfactory disclosures had been made.  *See Waldron v. Adams & Reese, LLP* (*In re American Int'l Refinery, Inc.*), 436 B.R. 364, 380 (Bankr. W.D. La. 2010) (counsel not found to be "disinterested" but required to disgorge $135,000, which was approximately 20% of total fees awarded, for serious disclosure omissions).

It may be appropriate at this point to comment upon the shifting nature of the responsibilities of legal counsel who has represented a client before a bankruptcy filing and continues to represent that client in a Chapter 11 case in its capacity as debtor-in-possession. Prior to bankruptcy the attorney's responsibilities, subject to applicable legal restrictions and ethical obligations of truthfulness to others, may be said to run principally to the client.  Once a Chapter 11 case is filed, however, and the attorney becomes counsel for the debtor-in-possession in the general conduct of the case, the attorney's obligations run to the bankruptcy estate.[25]  This does not mean that the wishes of individual creditors or even a creditors' committee are given

---

[24] *But see In re David Cutler Industries*, 432 B.R. at 549, in which the court strongly questions whether simply an appearance of impropriety is sufficient to disqualify counsel when no violation of an ethical rule has been determined, citing *Griffin-El v. Beard*, 2009 U.S. Dist. LEXIS 81028, 2009 WL 2929802 at *10 (E.D. Pa. Sept. 8, 2009).

[25] *See In re Hilal*, 534 F.3d 498, 501 (5th Cir. 2008); *In re JLM, Inc.*, 210 B.R. 19, 25 (2nd Cir. BAP 1997); *In re American Int'l Refinery, Inc.*, 436 B.R. at 376.  This view is not entirely settled, however.  *See Id.*, 436 B.R. at 376, for discussion and citation of cases in fn. # 3.

full sway, but simply that the broad collective interests of the creditors must be considered in

advising the debtor-in-possession as to its responsibilities in a Chapter 11 case.  Such collective

interests may require specific action of a highly adversarial nature, if necessary, against parties

in interest, such as recipients of property transfers which may be deemed in law fraudulent, but

which as a personal matter the debtor-in-possession may be loathe to pursue.  As this Court

noted in *Byington*:

> The role of counsel for the general conduct of a bankruptcy case on
> behalf of a debtor-in-possession encompasses both the assertion of all
> claims to which the debtor, or the debtor's bankruptcy estate,
> pursuant to the "strong arm" and avoidance powers provided by
> sections 544, 545, 547, 548, 549, and 553(b) of the Code, may be
> entitled, and the careful review of and, where appropriate, objection
> to all claims asserted against it.  The Code requires that an attorney
> employed by a debtor-in-possession to represent it generally in the
> conduct of the case must be able to give it wholly undiluted loyalty.

454 B.R. at 656-57.  One of the considerations weighed by this Court in that case, which

involved in part a pre-petition transfer by individual Chapter 11 debtors of three closely held

companies to a company owned by their son, was its assessment of whether counsel for them as

debtors-in-possession "would feel itself constrained from examining with a completely

unclouded eye the propriety of that transfer to him."  *Id.* at 658.

The Court has taken a considerable period of time to evaluate the evidence in this

dispute and to determine what should be the consequences of the findings of fact detailed in this

decision.  The parties have not cited any decisions presenting comparable circumstances of

counsel for a debtor-in-possession having given in effect a "green light" to his client to make a

pre-petition transfer to her son, which turned into a lawyer's nightmare after all of the relevant

facts became known, and where the attorney appears to have made a conscious effort, relying on

15

the attorney/client privilege, to prevent the parties and the Court from learning that he had been

consulted and given advice about the transfer after having received a $10,000 retainer and

deposit of the requisite filing fee for a Chapter 11 bankruptcy petition then clearly in prospect.

Neither has this Court's own research disclosed any decision on "all fours" with the situation

presented here, although there appear to be a few which have enough similarities to be helpful.

In *DeAngelis v. Geisenberger (In re Ressler Hardwoods & Flooring, Inc.)*, 2010

Bankr. LEXIS 1841, 2010 WL 2342497 (Bankr. M.D. Pa. June 8, 2010), the court granted a

similar motion to disqualify counsel and disgorge fees.  Prior to the bankruptcy case the attorney

had represented the debtor in a range of different business matters, including the potential sale of

an interest in the debtor's company.  The deal collapsed and the prospective buyer demanded the

return of advanced funds, but with the faulty assistance of the attorney the debtor instead issued

stock to the prospective buyer.  In the ensuing bankruptcy case and application to employ the

attorney, the attorney failed to disclose not only substantial legal fees received in the ninety-day

period before filing but also the extensive pre-petition services which had been provided to the

debtor.  During an adversary proceeding brought by the prospective buyer to recover the

advanced funds, the attorney's pre-petition connections to the debtor surfaced.  The court found

that these connections should have been disclosed in the application to employ the attorney in

order to determine disinterestedness, and further that the attorney was in fact not disinterested

because his ability to represent the debtor in the adversary proceeding was undermined by his

erroneous advice regarding the stock issuance.

The court in *In re American Int'l Refinery* also faced a motion for disgorgement

of attorney's fees, there based on pre-petition connections a law firm possessed with both the

16

debtor and one of its largest creditors.  As relevant here, it was alleged that the firm was involved

in the debtor's pre-petition dealings by serving as an escrow agent in a potentially fraudulent

transfer and by advising the debtor on restructuring efforts.  Although the court found that

neither was sufficient to make the firm not disinterested, it nevertheless determined that the

firm's disclosure of disinterestedness filed with the application to employ the firm was deficient

regarding the firm's pre-petition connections.  The court therefore ordered disgorgement of

approximately 20% of the fees the firm had previously been awarded.  In reaching its decision

that the firm's pre-petition representation did not create a disqualifying interest, the court noted

that "[i]t does not appear that . . . [the firm] opined on the validity of the transactions." 436 B.R.

at 379.

In *In re Atlantic Facilities, L.L.C.*, 2010 Bankr. LEXIS 1524, 2010 WL 1780299

(Bankr. E.D.N.C. Apr. 30, 2010), the court, upon a motion to reconsider its order approving the

employment of a law firm for the debtor, found that the pre-petition advice given by counsel to

the debtor within ninety days prior to the filing, which included a recommendation of merging

several entities into one, did not create any adverse interest.  According to the court, the merger

represented a potential savings to the creditors and administrative efficiency through a combined

filing.  While the court noted that a creditor expressed concerns about the propriety of the

transaction, investigation of it had not yet given rise to any theory that would cast the merger in

an improper light.  Therefore, the court allowed the continued employment of the firm as counsel

for the debtor, although it did order the debtor to employ special counsel with regard to a

company also represented by the same firm to which the debtor had made payments for trade

debts within ninety days of the filing date.

17

Both the United States Trustee and the Firm agree that the latter could not serve as counsel for the debtor-in-possession if it maintained a claim against the bankruptcy estate for any uncompensated pre-petition legal services. A very recent decision by Judge Krumm of this Court ruled to the same effect. *In re Russell 150, LC*, No. 11-51041, slip op. at 3 (Bankr. W.D. Va. Oct. 3, 2011). Nevertheless, the Firm's initial application for compensation, which has since been withdrawn, sought this Court's approval of compensation for over $2,100 in services which the former rendered to Ms. Vencill following the $2,000 payment to it on September 27, 2010 and up and including the date the petition was filed. Counsel for the United States Trustee has introduced applications made by the Firm in previous cases in which the same thing occurred and Mr. Copeland has conceded that such is the case, although not that it ever intended to maintain a claim against the estate for uncompensated pre-petition services. Mr. Copeland's original Declaration in this case was to the effect that the Firm did not have any pre-petition claim against the Debtor.

## DECISION

At the conclusion of the United States Trustee's evidence in support of the Motion given at the August 16 hearing, the Firm made a motion to strike the evidence and dismiss the Motion, which the Court at that time took under advisement. Now the Court will deny that motion to strike for the reason that the exhibits introduced into evidence at the hearing on behalf of the United States Trustee demonstrate inadequate disclosures on counsel's part at the time the application to employ the Firm was approved. They establish that there were facts which were known to counsel at that time but were not known by the Court, most particularly the facts that Mr. Copeland had been retained and received a $10,000 retainer and deposit of a

18

Chapter 11 bankruptcy case filing fee prior to the client's sale of property to her son disclosed in the SOFA, which likely would have been taken into consideration by this Court before ruling upon the application to employ.  The Court concludes that this showing together with the United States Trustee's evidence that the Firm did seek approval of compensation for previously uncompensated pre-petition services despite Mr. Copeland's declaration that the Firm had no pre-petition claim against the estate are sufficient to meet the United States Trustee's burden to demonstrate cause for the Court to revisit its original approval of the application to employ the Firm as counsel for the debtor-in-possession.  Accordingly, the motion to strike is denied.

The Court further concludes that the evidence now before the Court establishes cause for the disqualification of the Firm from further representation of the debtor-in-possession in this case.  Accordingly, the Court has determined that the Motion ought to be granted in preference to a disposition which would sanction the Firm by reduction of its approved compensation, an alternate disposition to which it has given considerable thought.  Its reasons for that determination are as follows:

1.  Mr. Copeland's role in advising his client about her desire to sell property to her son to beat a contemplated bankruptcy filing must have been extremely embarrassing to him when the information about the use value assessment versus the fair market value assessment came to light at the meeting of creditors, but he has endeavored to put matters aright by the subsequent agreement of the son to pay an additional $69,000 in order to keep the property.  The Court's initial leaning was to treat this matter as moot, at least with respect to the issue of the proposed disqualification of counsel was concerned, in light of the subsequent proceedings which were noticed to all parties in interest and ultimately approved by this Court.  Further reflection,

19

however, has persuaded the Court that Mr. Copeland's pre-petition advice has continued to affect, or at least may well have affected and continue to affect, his discharge of his duties as counsel for the estate in the following respects:

A.  The motion to approve sale which counsel ultimately proposed and was accepted contained a provision that the sale process would be open to permit higher bids for the property but that any prospective bidder would have to increase Mr. Vencill's offer by at least 5%, which would be $4,250 based on his $85,000 offer.  While such provisions are not uncommon in Chapter 11 sale contexts, they generally are utilized to obtain a willing "stalking horse" bidder to get the sale process started at some minimum price level acceptable to the estate.  Furthermore, there is ordinarily a preceding motion which is noticed to parties in interest to set the bidding procedures for the contemplated sale.  In this case, Mr. Vencill had already bought the property one time and wanted to keep it as he had previously offered the additional money reflecting the fair market value assessment.  In short, there was no need shown to entice Mr. Vencill into becoming a "stalking horse" bidder for the property, he already was one.  It further appears that the 5% upset bid provision was crafted by Mr. Copeland without input from other interested parties.  While it is no doubt true that a third party could have appeared at the hearing and objected to the proposed upset bid procedure, that would have required a bidder who was not only willing to pay more than $85,000 for the property but also was willing to challenge at the hearing the sale procedure which the Debtor had proposed, a factor which would seem to depress the possibility of competitive bidding at the court hearing.  So, a fair question is presented whether such a provision was favorable to the wishes of the Debtor and her son at the expense of the interest of the bankruptcy estate to encourage prospective bidders.

20

B. The issue of this pre-petition sale is raised in the United States Trustee's pending motion to convert this case to Chapter 7 yet to be heard.  Mr. Copeland has noted in his written argument that his client has not raised an "advice of counsel" defense to such motion. The critical factor with respect to the Motion before the Court, however, is whether such a defense ought to be considered by the Debtor and her counsel in defending against such motion to convert.  The Court fails to see how Mr. Copeland can provide completely unfettered and independent advice with respect to that matter, especially when her recollection of the advice he gave her about permissible use of the tax assessment to determine sale price is somewhat at odds with his own recollection on that point.  This concern is a matter which may affect counsel's future performance in this case, not simply a retrospective about how his awkward situation might have affected matters which have already been resolved.  This is sufficient reason, in the Court's judgment, to relieve Mr. Copeland from his further representation in this case and unfortunately to deprive the Debtor of her choice of counsel to represent the estate in the conduct of this case.

2. The Court concludes that Debtor's pre-petition advice to his client concerning a transfer of property which she wished to effect to a close family member for personal rather than business reasons was a "connection" which he was obliged to disclose explicitly in his Declaration accompanying the application to approve the Firm's employment.  The disclosure which was made, that the Firm had provided "specialized" advice to the client was vague to say the least and woefully inadequate to apprize the Court of a matter which could compromise counsel's vigorous representation of the interests of the bankruptcy estate.  The fact that he had given advice to her on such a matter, irrespective of what the advice was, obviously was a factor

21

which reasonably would influence his professional advice to the client as post-filing debtor-in-

possession about whether that transaction was suspect.  Mr. Copeland argues that the United

States Trustee has not proven that any creditor was prejudiced by these events.  The ready

answer to that assertion is that any arguable lack of any prejudice is a result of the diligence of a

creditor, absent which the very actual prejudice might have gone undetected.  The Court does not

wish to condone or be assumed to condone any pre-petition representation of bankruptcy clients

which encourages them to make transfers of property to family members for personal rather than

business reasons, on whatever terms might be set,[26] when a bankruptcy filing is clearly in

prospect and the client is already facing creditor enforcement actions.

3. While the Court does not attribute any intentional wrongdoing to counsel with respect

to the Firm's inclusion of uncompensated pre-petition services in its initial application for

compensation, nevertheless the latter is responsible for filing pleadings which were inconsistent

with each other (i.e., the Declaration and the application for compensation) and which appear to

have been filed without proper review and consideration.  There should be a clear disincentive

imposed by the Court when necessary to discourage such casual practices.

4. The Firm's initial disclosures in this case and the Debtor's disclosures which it

supervised and drafted, taken collectively, appear to have been designed to obscure from the

Court and other parties in interest the fact that the Debtor made a pre-petition transfer to a close

family member after she had already engaged counsel to file a Chapter 11 bankruptcy case for

_____

[26] As previously noted in this Court's September 9, 2010 decision, there is a decision
from the District Court of this District pointing out that even a sale for fair value might still
constitute a transfer intended to hinder or delay creditors.  *Cullinan Assocs. v. Clements (In re
Clements)*, 205 B.R. 377 (W.D.Va. 1995) (Kiser, J.).

22

her.  Whether that was a conscious purpose or simply a by-product of a casual approach to completion of the SOFA, in either case it is unacceptable practice and this Court desires to send an unmistakable message that it will not be condoned.

5. Finally, the Court also concludes that, under the circumstances presented in this case, the Firm's failure to conduct or obtain a review of the Russell County real estate records to disclose transactions within at least the preceding five years affecting the client's various real estate holdings and its further failure to obtain and examine the personal financial statements which the client had recently provided to lending institutions fall short of that standard of practice which its client and this Court had a right to expect.  The Court regrets making this observation because of Mr. Copeland's exceedingly extensive experience in representing Chapter 11 and other debtors in this Court, his broad knowledge of bankruptcy law and court decisions, and his undoubted effectiveness and aggressiveness in protecting and advancing his clients' interests with respect to their creditors.  Nevertheless, the Court concludes that such comment about the representation provided in this case is warranted and necessary for the proper explanation of its decision.

An order in accordance with the above decision will be entered contemporaneously herewith.

This 31st day of October, 2011.

William F. Stone, Jr.
_____
UNITED STATES BANKRUPTCY JUDGE